JUDGE GABRIEL dissenting.
¶ 60 I agree with much of the majority's analysis in this case. Unlike the majority, however, I believe that the trial court reversibly erred when it admitted a forensic pathologist's "overkill" testimony without making the specific finding of reliability required by People v. Shreck, 22 P.3d 68, 78 (Colo.2001). I would remand this case with directions that the trial court make that required finding. Accordingly, I respectfully dissent.
I. Discussion
¶ 61 Shreck states, in pertinent part, "[A] trial court's CRE 702 determination must be based upon specific findings on the record as to the helpfulness and reliability of the evidence proffered." Id. Here, it is undisputed that the trial court did not make specific findings regarding the reliability of the proffered evidence. The majority concludes, however, that this oversight does not warrant reversal or remand because the trial court "implicitly determined" that the pathologist's expert testimony was based on a reliable scientific principle. (I note that the People did not make such an argument on appeal; indeed, they simply did not address Ruibal's argument regarding the absence of the required finding.) The majority appears to base its determination that there was an implicit finding on the fact that the trial court admitted the evidence over Ruibal's CRE 702 objection. For two reasons, I disagree with that analysis.
¶ 62 First, if we can infer that a trial court implicitly found proffered expert testimony to be reliable based solely on the fact that the court admitted that evidence over objection, then Shreck 's requirement of a specific finding becomes meaningless.
¶ 63 Second, the cases on which the majority relies for its "implicit" finding analysis appear to trace back to People v. Johnson, 74 P.3d 349, 353 (Colo.App.2002). In Johnson, however, the expert opinion at issue involved "battered woman's syndrome" and the "cycle of violence," and the division noted that the *616 reliability of such evidence was "well recognized." Id. The division thus concluded that any error in the trial court's not making specific findings was harmless under the circumstances. Id.
¶ 64 In my view, a conclusion that the error was harmless is materially different from a conclusion that the trial court had implicitly made the required finding. Moreover, I perceive no basis in the record to allow me to conclude that the trial court had made any type of finding on the reliability of the "overkill" evidence at issue. To the contrary, the court found only that this evidence was "relevant and particularly helpful to the jury to put into context the type and nature of the injuries suffered by [the victim]," citing CRE 702 and 403. The court did not mention or allude to the issue of reliability, and neither of the cited evidence rules mentions the word "reliable." And unlike the battered woman's syndrome evidence at issue in Johnson, it is not clear to me that the reliability of the "overkill" evidence at issue here was (or is) "well recognized." See, e.g., State v. Wright, No. 0801010328, 2009 WL 3111047, at *8 (Del.Super.Ct. Sept. 14, 2009) (unpublished opinion) (concluding that there was no basis to admit an expert's opinion that "overkill" indicates personalized anger and sustained aggression or rage because that opinion did not meet the admissibility factors for reliability).
¶ 65 My view that we should not rely on a purported "implicit" finding here finds further support in the fact that the record presents a substantial question as to the reliability of the "overkill" evidence at issue.
¶ 66 The pathologist who presented this evidence testified, as pertinent here:
When I see that type of situation, whether it's a hundred stab wounds to the chest and face or multiple gunshot wounds or multiple blunt trauma injuries, I turn to the detective and I say obviously you're going to need to look into the possibility that this collection of injuries were [sic] caused by an individual who had a real or perceived strong emotional attachment to this victim.
If there are stab wounds in the rectum, that suggests a certain type of emotional attachment to the victim. If the breasts and external genitalia have been cut off, that suggests an emotional attachment to the victim. If there are blows about the head and face that are numerous and extensive, that indicates that the assailant likely had either a perceived or real emotional attachment to the victim.
¶ 67 The pathologist further testified that in the field of forensic pathology, this kind of "focused injury" is called "overkill," and he indicated that his opinions were based on (1) a treatise called Spitz and Fisher's Medicolegal Investigation of Death, see Spitz & Fisher's Medicolegal Investigation of Death: Guidelines for the Application of Pathology to Crime Investigation (Werner U. Spitz & Daniel J. Spitz eds., 4th ed. 2006) (Spitz & Fisher ); and (2) his own experience. It is not clear to me, however, that the pathologist's reliance on either of these sources sufficiently established that his opinions in this case were reliable.
¶ 68 With respect to Spitz & Fisher, the parties appear to agree that the pathologist was relying on the following three-sentence paragraph from that treatise's chapter on "Sharp Force Injury":
Multiple uniformly deep, parallel stab wounds clustered in one area of the body, commonly the chest or back, are usually the result of rapid thrusts and overkill. Such murders commonly suggest a crime of passion with sexual overtones, jealousy, or profound hate. Emotionally driven killings stand out from random killings by their excesses and mutilation.
Id. at 561. It also appears undisputed that entire sections of Spitz & Fisher concern blunt force trauma and strangulation, which were at issue in this case, but those sections did not address the concept of "overkill."
¶ 69 Accordingly, the pathologist extrapolated from Spitz & Fisher in two significant ways. First, he opined that the concept of "overkill" applies in the context of blunt force trauma and strangulation, even though Spitz & Fisher, on which he was relying, did not say that. Second, he averred that "overkill" shows that the assailant likely had either a perceived or real emotional attachment to the *617 victim, but Spitz & Fisher stated only that overkill suggests either a crime of passion with sexual overtones, jealousy, or profound hate or an emotionally-driven killing. Id. The treatise said nothing about any attachment between the assailant and the victim, which was the key part of the pathologist's testimony, given that it was offered to rebut Ruibal's alternate suspect theory and to suggest that Ruibal, who had a relationship with the victim, was her killer.
¶ 70 With respect to the pathologist's experience, to be sure, the pathologist had performed a substantial number of autopsies, many of which involved blunt force trauma and strangulation. That fact alone, however, did not establish either (1) that blunt force trauma and strangulation can support a conclusion of "overkill" or (2) if they can, that "overkill" suggests the assailant's real or perceived emotional attachment to the victim. To make these critical links, the prosecution needed to show that (1) the pathologist had seen blunt force trauma and strangulation victims in his practice; (2) the physical injuries that he had observed supported a conclusion of "overkill"; and (3) in the cases in which the pathologist was involved, the assailants had real or perceived emotional attachments to their victims. Although the evidence established the first of these requirements, it is not clear to me that it established either the second or the third. Indeed, regarding the third requirement, it appears that the pathologist's sole testimony was as follows:
Q In your experience and training you've personally seen these instances where you have these focused injuries and these focused injuries during an autopsy?
....
A Yes, of course it's been an experience. And I also have the experience of later knowing who confessed to doing what.
¶ 71 I am not so sure that this testimony sufficiently showed that the assailants in the cases in which the pathologist was involved had real or perceived emotional attachments to their victims. The pathologist did not testify as to how many cases he had seen, the nature of the injuries observed in those cases, what any assailants had confessed to, or how the pathologist came to know of such confessions.
¶ 72 For these reasons, I question whether the prosecution offered enough evidence to support the pathologist's extrapolations from what Spitz & Fisher had said about "overkill." To the contrary, these extrapolations were arguably based on nothing more than the pathologist's own bare assertions, and a court "may reject expert testimony that is connected to existing data only by a bare assertion resting on the authority of the expert." People v. Ramirez, 155 P.3d 371, 379 (Colo.2007).
¶ 73 Finally, I cannot say (nor does the majority say) that any error in admitting the pathologist's opinions regarding "overkill" was harmless. If that evidence were believed, it would have substantially undermined Ruibal's defense, which was that a stranger beat the victim. Moreover, the evidence was not so overwhelming as to allow me to conclude that the erroneous admission of the pathologist's testimony, if in fact it was erroneous, was harmless.
II. Conclusion
¶ 74 For the foregoing reasons, the record leaves me with serious doubt as to the reliability of the pathologist's "overkill" evidence in this case. In these circumstances, I would not infer a finding of the reliability of that evidence but rather would remand this case to the trial court with directions that the court make, based on the existing record, the specific findings that our supreme court has held are required. See Shreck, 22 P.3d at 78 ; see also United States v. Belyea, 159 Fed.Appx. 525, 530 (4th Cir.2005) (remanding to the district court for a more complete analysis of whether proffered expert testimony would assist the jury and whether it satisfied the applicable standards for assessing the reliability of such testimony); Deputy v. Lehman Bros., Inc., 345 F.3d 494, 508-09, (7th Cir. 2003) (reversing and remanding to allow the district court properly to assess whether handwriting analysis in general or the specific testimony at issue was admissible under Fed.R.Evid. 702 ); cf. People v. Mendoza, 876 P.2d 98, 100 (Colo.App.1994) ("When the trial court does not make all the findings necessary *618 under the Batson analysis, the appropriate remedy is to remand for further proceedings.").
¶ 75 Accordingly, I respectfully dissent.