Opinion by JUDGE TAUBMAN
¶ 1 Defendant, George J. Ruibal, appeals his judgment of conviction and sentence to forty years imprisonment entered on a jury verdict finding him guilty of second degree murder. Addressing an issue of first impression, we conclude that the trial court did not abuse its discretion in admitting expert testimony premised on the theory that victim "overkill" suggests that a perpetrator in a domestic violence situation had a real or perceived emotional attachment to the victim.
¶ 2 Therefore, we affirm the judgment. We also affirm Ruibal's sentence.
I. Background
¶ 3 The victim, D.P., was fatally beaten sometime during a December weekend in 2007. She died in the apartment that she and Ruibal shared. On the following Monday evening, Ruibal's coworker drove him home. Ruibal invited the coworker up to his apartment, and the two discovered D.P.'s body on the couch.
¶ 4 The prosecution charged Ruibal with D.P.'s murder. At trial, Ruibal presented an alternate suspect defense, asserting that D.P. was randomly assaulted by their neighbor, J.D., during a trip to the grocery store on Saturday evening. J.D. is a large man with a history of domestic violence. According to Ruibal, D.P. returned from the store bearing visible bruises, but refused to go to the hospital. He further alleged that D.P. was alive when he left for work on Monday morning, *609 and that he was unaware of the severity of her injuries until he returned that evening. The prosecution theorized that, in an act of domestic violence, Ruibal assaulted D.P. in their apartment on Saturday evening, and that D.P. died sometime on Sunday or Monday from injuries sustained in the beating.
¶ 5 The prosecution introduced the testimony of a forensic pathologist on evidence of "overkill." The pathologist explained that "overkill" means multiple injuries to one area of the body. He further stated that when he perceives "overkill" during an autopsy, he informs the police that the perpetrator likely had a real or perceived emotional attachment to the victim. He based his expert opinion on both a scientific treatise and his own experience.
¶ 6 The jury convicted Ruibal of second degree murder, and the trial court sentenced him to forty years in prison followed by five years of mandatory parole.
II. Domestic Violence Expert Testimony
¶ 7 Ruibal contends that the trial court erred when it did not give a limiting instruction during the testimony of the prosecution's domestic violence expert. Specifically, he asserts that CRE 404(b) and section 18-6-801.5(5), C.R.S.2014, required the court to give a limiting instruction for the testimony of the domestic violence expert, because her testimony placed previously admitted Rule 404(b) evidence within the context of an abusive relationship. We disagree.
A. Standard of Review
¶ 8 In addressing Ruibal's contention, we must consider when CRE 404(b) and section 18-6-801.5(5) require the trial court to give a limiting jury instruction, a question of statutory interpretation which we review de novo. People v. Steen, 2014 CO 9, ¶ 9, 318 P.3d 487, 490.
B. Applicable Law
¶ 9 CRE 404(b) and section 18-6-801.5 permit a trial court to admit evidence of other acts of domestic violence between a defendant and a victim if offered to show common plan, scheme, design, identity, modus operandi, motive, guilty knowledge, or some other purpose. People v. Torres, 141 P.3d 931, 934 (Colo.App. 2006) ; People v. Gross, 39 P.3d 1279, 1282 (Colo.App.2001). In such cases, the trial court must instruct the jury as to the limited purpose for which the other act evidence is admissible. § 18-6801.5(5).
C. Analysis
¶ 10 The prosecution called seven witnesses who testified to prior instances of domestic violence between Ruibal and D.P. Before each witness's testimony, the court read to the jury the limiting instruction required by section 18-6-801.5(5), and included a written version in the final jury instructions.
¶ 11 After the CRE 404(b) witnesses testified, the prosecution presented the testimony of a domestic violence expert who explained the dynamics of an abusive relationship. She testified that the crux of domestic violence is the exertion of power and control by the relationship's abusive member. Specifically, she testified that the act of strangulation is an intimate act in which the abuser looks into the face of the victim, and that abusive relationships undergo a recurring three-stage "cycle of violence," in which the level of violence exerted escalates over time.
¶ 12 However, the domestic violence expert, qualified under CRE 702, did not specifically reference any prior acts of domestic violence between Ruibal and D.P., and her testimony was not admitted through CRE 404(b) or section 18-6-801.5(2). Rather, she merely explained the general dynamics that exist in abusive relationships. See § 18-6-801.5(1) ("[D]omestic violence is frequently cyclical in nature, involves patterns of abuse, and can consist of harm with escalating levels of seriousness."). Furthermore, the expert was unfamiliar with the facts of Ruibal's case, and did not opine on the specifics of the relationship between Ruibal and D.P.
¶ 13 In fact, the trial court expressed concerns that an instruction similar to the one given during the CRE 404(b) testimony could prejudice Ruibal. The court explained that by giving such an instruction for a witness who was not a fact witness, it could lead the *610 jury to consider the expert's testimony as "fact evaluative," and not for its intended purpose of providing background on the nature of domestic violence.
¶ 14 Based on these circumstances, we conclude that the trial court did not err when it declined to give a limiting instruction during the testimony of the prosecution's domestic violence expert.
III. "Overkill" Testimony
¶ 15 Ruibal contends that the trial court abused its discretion when it permitted a pathologist to present expert testimony regarding victim "overkill." His contention here is twofold. First, he asserts that the trial court violated CRE 702 and People v. Shreck, 22 P.3d 68, 77 (Colo.2001), when it admitted scientifically unreliable "overkill" testimony without making a specific finding as to its reliability. Second, he argues that the trial court violated CRE 703 when it permitted the introduction, through expert testimony, of inadmissible hearsay evidence. We perceive no reversible error.
A. Standard of Review
¶ 16 We review a trial court's CRE 703 ruling for an abuse of discretion. See People v. Valencia, 257 P.3d 1203, 1206 (Colo.App.2011). Further, trial courts have broad discretion to determine the admissibility of expert testimony, and we will not overturn a court's decision absent a showing of an abuse of discretion. Estate of Ford v. Eicher, 250 P.3d 262, 266 (Colo.2011).
¶ 17 Ruibal objected to the "overkill" testimony and to the prosecution's alleged CRE 703 violation; therefore, we review for harmless error and will reverse only if the error "substantially influenced the verdict or affected the fairness of the trial proceedings." Hagos v. People, 2012 CO 63, ¶ 12, 288 P.3d 116, 119.
B. CRE 702
¶ 18 CRE 702 permits the testimony of expert witnesses, qualified by their knowledge, skill, experience, training, or education, if the trial court determines that it will assist the trier of fact to understand the evidence or determine a fact in issue. Shreck, 22 P.3d at 77.
¶ 19 Before admitting expert testimony, a trial court must consider whether (1) the scientific principles underlying the testimony are reasonably reliable; (2) the expert is qualified to opine on such matters; (3) the expert testimony will be helpful to the jury; and (4) pursuant to CRE 403, the evidence's probative value is not outweighed by the danger of unfair prejudice. Id. Finally, "[w]hen the trial court makes a determination of relevance and reliability under CRE 702, it is required to issue specific findings regarding its analysis." Estate of Ford, 250 P.3d at 266.
¶ 20 Here, the prosecution introduced the testimony of a forensic pathologist on evidence of "overkill." He testified that when he observes multiple injuries to one area of the body, he informs the police that the perpetrator likely had a real or perceived emotional attachment to the victim. The prosecution introduced the pathologist's testimony to put D.P.'s injuries in context for the jury, and to prove that the perpetrator likely had an emotional attachment to her, thus tending to disprove Ruibal's alternate suspect theory.
¶ 21 Before admitting the pathologist's testimony, the court held a hearing to determine its admissibility. Specifically, it considered one scientific treatise that addressed the theory of "overkill" in its section on sharp force injuries. After the parties presented their arguments, the court concluded that the "overkill" testimony would be helpful to the jury by putting into context the type and nature of the injuries suffered by D.P. The court also concluded that the testimony satisfied CRE 403 because its probative value outweighed any danger of unfair prejudice. Later, during the pathologist's direct examination, the court concluded that he was qualified to offer an expert opinion on "overkill" evidence.
¶ 22 However, the trial court did not make a specific finding, as required by Shreck, that the scientific principles underlying the "overkill" testimony were reasonably reliable. 22 P.3d at 77.
*611 ¶ 23 While it would have been preferable for the court to have specifically found that the "overkill" testimony was reliable, we conclude that this oversight does not warrant reversal or remand.See Tatum v. Basin Res., Inc., 141 P.3d 863, 869 (Colo.App.2005) (absence of specific findings on reliability of underlying scientific principle does not warrant reversal where findings can be inferred from trial court's ruling); People v. McAfee, 104 P.3d 226, 229 (Colo.App.2004) (same); People v. Johnson, 74 P.3d 349, 353 (Colo.App.2002) (same); see also People v. Jimenez, 217 P.3d 841, 868 (Colo.App.2008) ("[A]ny error in the degree of detail of the district court's findings did not prejudice defendant, and therefore any such error does not cast doubt on the reliability of the district court's decisions.").
¶ 24 We too conclude that by overruling Ruibal's objection to the "overkill" evidence, the trial court implicitly determined that the pathologist's expert testimony was based on a reliable scientific principle. While it should have entered specific findings on the reliability of the underlying scientific theories, the trial court did not commit reversible error when it admitted the "overkill" testimony without specifically finding that the underlying science was reliable.
¶ 25 We recognize that Colorado appellate courts have not addressed whether, under CRE 702, evidence of "overkill" is a reliable indicator of a perpetrator's identity. However, courts in other jurisdictions have relied on evidence of "overkill" to prove identity and intent in domestic violence cases. See, e.g., People v. Varela, No. B197473, 2008 WL 2764578, at *5 (Cal.Ct.App.2008) (unpublished opinion) (evidence of overkill probative of defendant's mental state at time of killing); State v. Suttle, No. A-2417-08T3, 2011 WL 2314474, at *5 (N.J.Super. Ct.App. Div. June 10, 2011) (unpublished opinion) ("The prosecutor also argued that the crime was 'personal' and was overkill based on the number of blows struck."); Richardson v. State, 83 S.W.3d 332, 339 (Tex.Crim.App.2002) (relying on expert testimony that "crimes of passion are generally overkills with dozens and dozens of stab wounds").
¶ 26 Further, our conclusion is consistent with the broad discretion given to trial courts in admitting expert testimony in domestic violence cases. See, e.g., People v. Lafferty, 9 P.3d 1132, 1135 (Colo.App.1999) (and cases cited therein). Because jurors may not have experience with domestic violence, expert testimony is often relied on to explain victim and defendant behavior in such cases. See Myrna S. Raeder, The Better Way: The Role of Batterers' Profiles and Expert "Social Framework" Background in Cases Implicating Domestic Violence, 68 U. Colo. L.Rev. 147, 182-83 (1997) ("[W]ithout a shared background regarding domestic violence, jurors are less likely to believe that batterers' admitted killings are premeditated and may consider that the 'overkill' associated with victims of domestic violence has no relevance to whether the murderer was her abusive mate or a stranger.") (footnote omitted). For example, expert testimony is often necessary to explain victims' recantations, and the escalating nature of abusive relationships. People v. Wallin, 167 P.3d 183, 187 (Colo.App.2007) ; see also People v. Yaklich, 833 P.2d 758 (Colo.App.1991) (evidence of battered woman syndrome admissible to establish a defense of self-defense); Lafferty, 9 P.3d at 1135 (expert testimony about "cycle of violence" syndrome admissible to explain victim's recantation about assault).
¶ 27 Ruibal also contends that the pathologist's "overkill" theory is unreliable. Specifically, he asserts that the pathologist's reliance on a single treatise was misplaced because (1) overkill is addressed only in the section of the treatise involving sharp force injuries, such as stabbings, and (2) the treatise is not an "authoritative text."
¶ 28 First, that "overkill" is addressed only in the sharp force injury context does not make the theory inapplicable or unreliable in the circumstances presented here. The trial court could reasonably have analogized the treatise's analysis to the facts here, which involved allegations that Ruibal repeatedly punched and kicked D.P.
¶ 29 Second, the pathologist later explained that the difference between an authoritative text and a learned treatise is semantic. Specifically, he testified that while *612 both authoritative texts and learned treatises are grounded in medical observations and testing, an authoritative text is one that theoretically cannot be challenged. The pathologist explained that he would not characterize the treatise in question as "authoritative," mainly because "medical science marches forward" and something that was authoritative "ten years ago may well be completely unreasonable [today]." Furthermore, CRE 702 does not require experts to rely only on "authoritative sources," but rather any "knowledge, skill, experience, training, or education." The pathologist relied not only on the learned treatise, but also on his own experience examining victims of domestic violence when he described the phenomenon of overkill.
¶ 30 Relying on People v. Ramirez, 155 P.3d 371, 379 (Colo.2007), Ruibal also contends the trial court abused its discretion in admitting the expert's overkill testimony because "a court may reject expert testimony that is connected to existing data only by a bare assertion resting on the authority of the expert." We disagree.
¶ 31 Here, the pathologist's testimony about overkill was more than a bare assertion. He testified that he had performed approximately 3000 autopsies, many of which involved multiple, focused injuries. Thus, he had ample experience to provide his expert opinion testimony about overkill.
¶ 32 Therefore, we conclude that the trial court did not err when it admitted the pathologist's "overkill" testimony without making a specific finding on its reliability.
C. CRE 703
¶ 33 CRE 703 provides that the facts or data on which an expert bases an opinion need not be admissible as evidence for the opinion to be admitted. However, it further provides that if such facts or data are themselves inadmissible, then they cannot be disclosed to the jury by the proponent "unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."
¶ 34 On redirect examination, the pathologist expert explained that he based his "overkill" testimony, not only on scientific literature, but also his own experiences:
Prosecutor: In your experience and training you've personally seen these instances where you have these focused injuries ... during an autopsy?
Expert: Yes, of course it's been an experience. And I also have the experience of later knowing who confessed to doing what.
¶ 35 Ruibal objected that the pathologist's answer was inadmissible under CRE 703, but his objection was overruled. On appeal, Ruibal asserts that the expert's testimony implied that his experience was based on confessions. These confessions, he argues, constituted inadmissible hearsay evidence that should not have been admitted pursuant to CRE 703 without the trial court first determining that their probative value substantially outweighed their prejudicial effect. We disagree.
¶ 36 We conclude that the pathologist's expert testimony quoted above is admissible under CRE 703 as describing his experience. Under CRE 703, experts may describe statements of other persons when they form the basis of their opinions. Leiting v. Mutha, 58 P.3d 1049, 1054 (Colo.App.2002) ; People v. Bornman, 953 P.2d 952, 956 (Colo.App.1997). Such a description is not offered for the truth of the matter asserted; rather, it is offered to explain the basis of the expert opinion and to establish the expert witness's qualifications. Bornman, 953 P.2d at 956.
¶ 37 Here, the pathologist testified that some of his experiences with "overkill" evidence included instances where he "later" learned "who confessed to doing what." He did not testify to the specifics of these confessions or specific statements or assertions; rather, he merely highlighted those instances involving confessions to describe his experience, link multiple injuries in domestic violence cases to overkill, and establish his expert qualifications.
¶ 38 Furthermore, although Ruibal argues that the statement is inadmissible hearsay, the trial court had no basis for determining *613 that the expert's knowledge of later "knowing who confessed to doing what" derived from inadmissible out-of-court statements.
¶ 39 Therefore, we conclude that the trial court did not err when it permitted the "overkill" expert to testify that his opinion was based on his experience in which he later learned "who confessed to doing what."
IV. Photographs of D.P.'s Brain
¶ 40 Ruibal contends that the trial court abused its discretion when it admitted five gruesome color photographs which showed the inside of D.P.'s head. Specifically, he contends that the photographs were relevant to an undisputed fact, and that their probative value was substantially outweighed by the risk of unfair prejudice. We disagree.
A. Standard of Review
¶ 41 It is within the trial court's discretion to decide whether photographs are unnecessarily gruesome or inflammatory, and the court's decision will not be reversed absent a showing of an abuse of discretion. People v. Dunlap, 975 P.2d 723, 746 (Colo.1999).
B. Applicable Law
¶ 42 "Photographs of a homicide victim are admissible at trial when they depict the appearance of the victim, the location and nature of the wounds, or other facts that would be competent for a witness to describe in words." People v. Raglin, 21 P.3d 419, 427 (Colo.App.2000), overruled on other grounds by Fain v. People, 2014 CO 69, 329 P.3d 270 ; Dunlap, 975 P.2d at 726 ("Photographs are admissible to depict graphically anything a witness may describe in words." (quoting People v. Roark, 643 P.2d 756, 762 (Colo.1982) )).
¶ 43 However, under CRE 403, otherwise relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice. Evidence is unfairly prejudicial under CRE 403 if it has an " 'undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.' " People v. Herrera, 2012 COA 13, ¶ 41, 272 P.3d 1158, 1166 (quoting Masters v. People, 58 P.3d 979, 1001 (Colo.2002) ). While the rule "is an important tool to exclude matters of scant or cumulative probative force," CRE 403 favors the admission of evidence. Yusem v. People, 210 P.3d 458, 467 (Colo.2009) (internal quotation marks and alterations omitted).
¶ 44 CRE 403 balancing involves consideration of the available alternative means of proof, whether the fact of consequence for which the evidence offered is disputed, and the importance of the fact of consequence for which the evidence is offered.Id .
C. Analysis
¶ 45 During the testimony of the prosecution's forensic pathologist, the court admitted five color photographs showing the inside of D.P.'s head, to support the conclusion that D.P. died as a result of a closed head injury and internal bleeding.
¶ 46 Ruibal relies on People v. Ellis, 41 Colo.App. 271, 589 P.2d 494 (1978), to argue that the trial court should have excluded the photographs. In Ellis, a division of this court held that the trial court abused its discretion in admitting four photographs of the deceased victim's internal organs, including three photographs of the victim's brain. Id . at 272, 589 P.2d at 495. The division concluded that the photographs should have been excluded because they were probative only of the victim's cause of death, a fact that was undisputed by the defendant. Id. ; see also People v. McClelland, 2015 COA 1, ¶ 50, 350 P.3d 976 (evidence of undisputed facts has marginal probative value).
¶ 47 We agree with Ruibal that, like in Ellis, D.P.'s cause of death was undisputed. However, the photographs of D.P.'s head refute Ruibal's alternative suspect theory. At trial, Ruibal claimed that D.P. was randomly assaulted a day or two before she passed away, and that, after the assault, she was able to walk home. The forensic pathologist testified that D.P.'s brain injuries suggested that she had been knocked unconscious and slowly succumbed to her injuries. She further *614 testified that Ruibal's suggested scenario was highly unlikely. See People v. Harris, 633 P.2d 1095, 1097 (Colo.App.1981) (distinguishing Ellis and admitting gruesome photographs because each was "probative with respect to the trial's pivotal and most hotly contested issue").
¶ 48 Furthermore, the severity of D.P.'s injuries was probative of Ruibal's mental state because the photographs tended to show that Ruibal acted with the intent to cause serious bodily injury, rather than negligently or recklessly. The court instructed the jury on second degree murder, manslaughter, and criminally negligent homicide, and it had to decide whether Ruibal acted negligently, recklessly, or with intent to cause serious bodily injury when he assaulted D.P. See Raglin, 21 P.3d at 428 (seven graphic and inflammatory photographs of deceased victim were probative of defendant's culpable mental state).
¶ 49 Ruibal does not dispute the photographs' probative value; rather, he argues that the photographs were unnecessary because other, less gruesome photographs established the extent of D.P.'s injuries. However, while other admitted photographs revealed the severity of D.P.'s external injuries, the forensic pathologist used the photographs of the inside of D.P.'s head to testify about the location, nature, and extent of her internal brain injuries, which, she explained, eventually caused D.P.'s death. Furthermore, the trial court could have concluded that the external photographs were equally gruesome, and any additional prejudice to Ruibal would have been comparatively minor.
¶ 50 Therefore, we conclude that the trial court did not abuse its discretion when it admitted multiple color photographs which showed the inside of D.P.'s head.
V. Cumulative Error
¶ 51 Ruibal contends that cumulative error deprived him of a fair trial and his right to due process. Specifically, he contends that if two or more errors are found, but no one error is sufficiently harmful to itself require reversal, combined with improper testimony about a defense witness's misdemeanor conviction, then we should consider whether cumulative error requires reversal.
¶ 52 "As a general rule, evidence of a prior misdemeanor is inadmissible for impeachment purposes." People v. Gilbert, 12 P.3d 331, 339-40 (Colo.App.2000). The parties agree that the trial court thus erred when it permitted the prosecution to impeach a defense witness with evidence of a prior misdemeanor conviction. Yet this issue was not raised as a separate contention by Ruibal, only as an adjunct to his cumulative error argument. Consequently, having discerned no other error, we need not address this contention.
VI. Sentencing Error
¶ 53 Finally, Ruibal contends that the trial court abused its discretion during sentencing when it explicitly declined to consider favorable aspects of his character. We disagree.
A. Standard of Review
¶ 54 Trial courts are afforded wide latitude in imposing sentences, and we review sentencing decisions for an abuse of discretion. People v. Martinez, 179 P.3d 23, 25 (Colo.App.2007).
B. Applicable Law
¶ 55 A sentencing court must consider the nature and elements of the offense, the character and rehabilitative potential of the offender, any aggravating or mitigating circumstances, and the public interest in safety and deterrence. People v. Campbell, 58 P.3d 1080, 1086-87 (Colo.App.2002). While a sentencing court may find one aggravating factor more compelling than another, it abuses its discretion when it places "undue emphasis on any one of these factors to the exclusion of the others." Id. at 1087.
C. Analysis
¶ 56 During sentencing, several witnesses provided evidence of favorable aspects of Ruibal's character. The trial court explicitly addressed Ruibal's good character and behavior throughout the proceedings. It recognized that he had been polite and respectful *615 during the police investigation and throughout the criminal proceedings, and that several people supported him and praised his character. It also recognized that he had a strong employment history and no prior felony convictions.
¶ 57 Although the court noted that these good character traits were mitigating factors, it told Ruibal, "I don't sentence people based on their character." Instead, the court told Ruibal, "I'm going to sentence you based on your conduct and what you did to [D.P.]." Later, immediately before imposing a sentence, the court listed the factors it considered in deciding Ruibal's sentence: the gravity of the offense; the promotion of rehabilitation; the interests of fair and consistent treatment; providing fair warning to others; preventing crime; promoting respect for the law; and deterring other potential offenders. Absent from these factors was any mention of Ruibal's good character, a factor the court was required to consider.
¶ 58 We conclude that the trial court did not abuse its sentencing discretion when it made the above statements. The trial court explicitly referenced several of Ruibal's positive character traits. To the extent that the trial court's statement suggested that it was not considering Ruibal's good character, Ruibal had an obligation to ask for clarification from the trial court. See People v. DiGuglielmo, 33 P.3d 1248, 1251 (Colo.App.2001) (if defendant receives advice from counsel or the providency court that differs from information in written plea documents, the defendant must ask court for clarification). Here, Ruibal did not ask for clarification from the court. Such clarification would have been helpful because the court's comments could be interpreted either that it was disregarding evidence of Ruibal's good character, or that it was focusing its sentencing determination on Ruibal's conduct, rather than on his good character.
¶ 59 Therefore, we conclude that the trial court did not abuse its discretion during sentencing.
VII. Conclusion
The judgment and sentence are affirmed.
Booras, J., concurs
Gabriel, J., dissents