23CA0333 Peo v Sugg 05-14-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0333
Arapahoe County District Court No. 20CR164
Honorable Eric White, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Gregory Shad Sugg,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE MEIRINK
J. Jones and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced May 14, 2026

---

Philip J. Weiser, Attorney General, Trina K. Kissel, Senior Assistant Attorney General and Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jeffrey A. Wermer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Gregory Shad Sugg, appeals the trial court's judgment of conviction entered on a jury verdict finding him guilty of child abuse (serious bodily injury).  We affirm.

## I.    Background

¶ 2    Sugg and his fiancee, L.D., lived together with their infant son, J.D.  A few months after J.D.'s birth, L.D. returned to work after taking maternity leave, and Sugg became J.D.'s primary caretaker.

¶ 3    In January 2020, when J.D. was about five months old, Sugg and L.D. took him to the pediatrician because he was vomiting and crying like he was in pain.  The pediatrician sent them to the hospital for a stomach ultrasound.  J.D.'s stomach was fine, but doctors noticed that the soft spot on his head was bulging, so they conducted an MRI, which revealed that J.D. had hemorrhaging in his brain.  Doctors also conducted a CT scan, which revealed that J.D. had numerous retinal hemorrhages in both eyes.

¶ 4    Doctors conducted additional tests and considered and rejected bleeding disorders, cancer, sepsis, and metabolic genetic disorders as the cause of the bleeding.  They also rejected the theory that a short fall L.D. had while holding J.D. a few weeks prior was the cause of the bleeding because the type of brain injury

1

J.D. had was the result of severe trauma — like from "a motor vehicle accident" or "falling out of a window." J.D.'s treating physicians ultimately diagnosed J.D. with abusive head trauma (AHT).[1]

¶ 5     Three days after J.D.'s hospitalization, Sugg participated in a voluntary interview with a police officer. Sugg told the officer that, the day after Christmas, as L.D. was going to pull J.D. out of his swing, she tripped on the swing's leg and fell and hit her knees and shins on the hardwood floor while holding J.D. Sugg was uncertain if J.D.'s head "hit the Pack n' Play or possibly went down to the floor or [whether] just that jerking motion in general" affected J.D. But he confirmed that the doctors said, "It couldn't have been that

---

[1] "Abusive Head Trauma" (AHT) replaced the term "Shaken Baby Syndrome" (SBS) in the medical community because "the etiology of the injury is multifactorial (shaking, shaking and impact, impact, etc.)," and AHT was "the current best and inclusive term." Arabinda Kumar Choudhary et al., *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 48 Pediatric Radiology 1048, 1048 (2018). The relevant case law in Colorado predates the use of the term AHT and still refers to SBS or "Shaken-Impact Syndrome." *See, e.g., People v. Rector*, 248 P.3d 1196, 1198 (Colo. 2011); *People v. Martinez*, 74 P.3d 316, 324 (Colo. 2003). At trial and on appeal, the People primarily refer to AHT or "non-accidental trauma," while Sugg's counsel refers to SBS and SBS/AHT. To avoid confusion, we will use "SBS/AHT" unless referring to a specific instance in the record when "AHT" or "SBS" was used.

[incident,] it had to be sooner." After the officer probed him about J.D.'s injury, Sugg said that he rocked J.D. "[m]aybe too long or too hard, I don't know. But I – it wasn't intentional" and that J.D. went to sleep after Sugg rocked him. However, after he fell asleep, J.D. started to throw up and it "kept gettin' worse." At that point, he and L.D. took J.D. to see a doctor. Sugg told the officers that he was "blaming [the injuries] on the fall" and was "[s]till kinda holdin' on hope until [the hospital visit in January 2020] that it was somethin' else," because he "truly didn't believe [he] had hurt [J.D.]"

¶ 6      The People charged Sugg with child abuse resulting in serious bodily injury under section 18-6-401(1)(a) and (7)(a)(III), C.R.S. 2025, a class 3 felony. Sugg's defense was that the medical team that treated J.D. erred by rushing to diagnose him with SBS/AHT, which Sugg contends has unreliable scientific underpinnings. In so doing, the team prematurely ruled out other causes, including that J.D. had macrocephaly, which could have put him at risk of receiving similar injuries without trauma. A jury found Sugg guilty, and the court sentenced him to twenty-four years in the custody of the Department of Corrections.

II.    Analysis

¶ 7    Sugg contends that the trial court erred by (1) declining to hold an evidentiary hearing under *People v. Shreck*, 22 P.3d 68 (Colo. 2001), and denying his motion to exclude SBS/AHT evidence as the cause of J.D.'s injuries; (2) admitting the neighbors' testimony as prior acts evidence; and (3) refusing to provide a remedy when L.D. revealed new evidence after closing arguments. Addressing each contention in turn, we disagree.

### A.    The Trial Court Didn't Err by Declining to Hold a *Shreck* Hearing and Admitting Evidence of SBS/AHT

¶ 8    Sugg argues that the SBS/AHT evidence was unreliable, not helpful to the jury, and had minimal probative value that was substantially outweighed by the danger of unfair prejudice. Sugg also argues that a *Shreck* hearing was necessary because SBS/AHT is based on flawed science and lacks reliability. We disagree.

### 1.    Additional Applicable Facts

¶ 9    The prosecution sought to introduce expert testimony from several physicians who treated J.D., examined his medical records, or both. Anticipating that these experts would testify that J.D. was injured as a result of SBS/AHT and that his injuries could only

have been caused by child abuse — specifically Sugg shaking J.D. — Sugg moved to exclude the use of terminology like "shaken baby" or "abusive head trauma," "any testimony that states or implies that the 'triad' (retinal hemorrhage, subdural hematoma, and hypoxic/ischemic injury or encephalopathy) is in any manner diagnostic of abuse[,] and testimony that suggests shaking was the possible cause of injuries in this case." Sugg also asserted that the scientific principles underlying SBS/AHT are unreliable and that the proffered expert testimony wouldn't be useful to the jury. In the alternative, Sugg asked the court to conduct a *Shreck* hearing.

¶ 10    In response, the prosecution argued that the scientific principles of AHT are reliable, relevant, and supported by a "Consensus Statement" published by the journal Pediatric Radiology in 2018 and later endorsed in 2021 by seventeen pediatric professional societies worldwide. *See* Arabinda Kumar Choudhary et al., *Consensus Statement on Abusive Head Trauma in Infants and Young Children*, 48 Pediatric Radiology 1048, 1048 (2018). The prosecution also countered that, because a team of physicians treated J.D. and provided a multidisciplinary diagnosis, each physician's testimony would assist the jury based on their

5

respective areas of expertise and help the jury determine the potential source of J.D.'s injuries.

¶ 11    The court denied the motion and concluded that a *Shreck* hearing was unnecessary.  It found that (1) the prosecution's proposed experts were all medical doctors; (2) Sugg didn't challenge their qualifications; (3) the scientific principles underlying the experts' proposed testimony were reliable; (4) SBS/AHT had been recognized as a valid scientific diagnosis in *People v. Martinez*, 74 P.3d 316, 323 (Colo. 2003), and *People v. Rector*, 248 P.3d 1196, 1202 (Colo. 2011);[2] (5) the testimony would be helpful to the jury; and (6) the testimony's probative value wasn't substantially outweighed by the danger of unfair prejudice under CRE 403.

¶ 12    Several doctors testified for the prosecution at trial, including Dr. Michael Puente, a pediatric ophthalmologist; Dr. Laura Fenton,

---

[2] Although the trial court's characterization of the cases doesn't impact our analysis, we would nevertheless like to clarify that in *Martinez*, 74 P.3d at 323, the supreme court held that "the scientific principles of shaken-impact syndrome and subdural hematomas resulting from extreme accidents are reasonably reliable."  But in *Rector*, the supreme court noted that "[t]he parties debate[d] whether *Martinez* [wa]s dispositive of whether [SBS] testimony is admissible under CRE 702" and concluded that, "[b]ecause [SBS] was not ultimately at issue in this case," it "decline[d] to address the issue."  248 P.3d at 1202 n.8.

6

a pediatric radiologist; and Dr. Corbett Wilkinson, a pediatric neurosurgeon. These doctors all testified that they had treated J.D. at the hospital and had reviewed his medical records and test results. Although he didn't treat J.D., Dr. Andrew Sirotnak, an expert in child abuse pediatrics, also testified and stated that he had reviewed J.D.'s medical file, which included test results, reports, and imaging.

¶ 13    The doctors explained their respective fields of expertise to the jury, what certain medical terms meant, and how they looked at different aspects of J.D.'s injuries. First, Dr. Puente described the extent of J.D.'s eye injuries and testified that he saw "bleeding in multiple layers of the retina," and that the "hemorrhaging extending far out into the periphery of both eyes" indicated to him "that [J.D.] was likely to have suffered a severe injury or insult to his brain or to his eyes."

¶ 14    Next, Dr. Fenton testified that she reviewed the CT scans and MRI images of J.D.'s brain to assess the extent of his brain hemorrhaging (both subarachnoid and subdural). She explained that a subarachnoid hemorrhage referred to bleeding in the space between the brain and the membrane covering it, while a subdural

7

hemorrhage is bleeding occurring closer to the skull. Dr. Fenton testified that J.D. had a "bridging vein injury" because one of the veins "bridging the outer part of [J.D.'s] skull and brain" bleeds. She clarified that a bridging vein injury can only be caused by severe trauma. In contrast, she explained that "if the hemorrhage was primarily in the subarachnoid space, we would have a completely different discussion of the causes because there, [with a] subarachnoid hemorrhage alone we think about a vascular or vessel injury, like an aneurysm." Because J.D. had both subdural and subarachnoid hemorrhaging (instead of only subarachnoid), Dr. Fenton ruled out an aneurysm and opined that the injury was caused by trauma.

¶ 15    Dr. Wilkinson testified that J.D.'s CT scan showed "a normal-looking brain," but that there was "cerebrospinal fluid subarachnoid spaces around the brain" and "additional fluid in a subdural space." He also testified that J.D.'s "soft spot was bulging, meaning there was some pressure" on J.D.'s brain. When asked what his chief concerns are when he sees J.D.'s types of injuries in a child, Dr. Wilkinson replied that "the subdural

hematoma and retinal hemorrhages are two of the things that you

can see in abusive head injury."

¶ 16    Doctors Puente, Fenton, and Wilkinson testified that they were

experts in their specific fields but clarified that they worked

together to make a multidisciplinary diagnosis of AHT.  Dr. Sirotnak

explained his role as an expert in child abuse pediatrics and put a

finer point on the multidisciplinary diagnosis approach the hospital

uses:

> When we have an injured child, we access the
> appropriate services like trauma surgery,
> neurosurgery.  We have medicine in the cases
> of brain injuries or physical injuries, and a lot
> of physical therapists that help us help a
> family understand an injury but also provide a
> treatment plan for a family.
>
> . . . .
>
> [W]e all work together as a group or a team in
> the hospital, particularly when you have a
> critically ill kid or an injured kid[,] to put
> together the best treatment plan and to make
> recommendations for care for that child and
> family.
>
> So in [AHT], depending on the presentation of
> the brain injury, we're going to be looking at
> the things that can present as a brain injury or
> bleeding in the brain.

Dr. Sirotnak further explained that, when making an AHT diagnosis, the doctors

> look[] at a list or possibilities of diagnoses and not just anchoring to one thing. So when I see, for example, I saw a rash in a patient that had a fever and maybe had some diarrhea but also was on some pretty complicated medicines, so I'm working with a nurse who's seen this kind of reaction — skin reaction from this medicine. I'm not just going to say, oh, I think that's an infection. I have to think broadly to other things. So in abusive head trauma, depending on the presentation of a brain injury, we're going to be looking at things that can present as a brain injury or bleeding in the brain. Depending on the type of child that's coming in to us with a presentation, we may have a list that's short or may have a list that's long.

¶ 17    Sugg's counsel objected to the experts' use of the phrase "abusive head trauma," but the court overruled the objections. The prosecution's experts also rejected the claim by Sugg's expert that the diagnosing team made a "knee-jerk reaction" and misdiagnosed J.D., and that there were no other plausible diagnoses for J.D.'s injuries other than AHT.

¶ 18    Sugg presented expert testimony by Dr. Robert Rothfeder contesting the prosecution's theory that J.D.'s injuries could only have been caused by trauma. Dr. Rothfeder didn't treat J.D. but

reviewed his care files.  He testified that J.D. had macrocephaly —

specifically, he had a head circumference that was in the ninety-

ninth percentile, meaning "99 percent of all children born at term

would have a smaller head" — and that he had "rarely seen that

sort of head size, particularly with the fact that it's so

disproportionate to his length and weight."  Dr. Rothfeder explained

that J.D.'s head size meant that he had a lot of space that was

occupied by fluid.  Because there was so much space between

J.D.'s brain and skull, the bridging veins could elongate and stretch

and were at risk of tearing or leaking with little to no trauma.  With

respect to retinal bleeding, he testified that

> retinal hemorrhages occur in the absence of
> trauma and they occur . . . with trauma when
> the brain has been involved, and the
> mechanism is when the pressure inside the
> head exceeds the pressure in the veins that
> drain the eye, there's no way for the blood to
> get back to the heart, and it can leak out
> through the small vessels in the eye and
> produce retinal hemorrhages.

Dr. Rothfeder also testified that he doubted whether violent shaking

of a child could cause subdural hemorrhaging and that he didn't

believe that J.D.'s injuries were consistent with SBS/AHT.

11

## 2. Applicable Law and Standard of Review

¶ 19   CRE 702 governs the admissibility of scientific evidence and expert testimony. *See Shreck*, 22 P.3d at 77; CRE 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."). When determining the admissibility of scientific evidence, a trial court's inquiry should be "broad in nature" and flexible, with the goal of assessing whether the evidence is relevant and reliable. *Shreck*, 22 P.3d at 77. In making this determination, a trial court should assess whether (1) the scientific principles underlying the expert's testimony are reliable; (2) the expert is qualified to give an opinion on the subject; (3) the testimony will be helpful to the jury; and (4) the probative value of the testimony is substantially outweighed by the danger of unfair prejudice. *See id.* at 77-79; *see also Rector*, 248 P.3d at 1200.

¶ 20   When a party requests a *Shreck* analysis, the court may, in its discretion, determine whether an evidentiary hearing would be helpful. *Rector*, 248 P.3d at 1201. However, the court isn't

required to conduct a *Shreck* hearing if it has sufficient information to make specific findings under CRE 403 and CRE 702 about the four factors listed above. *Id.*

¶ 21  To be admissible, the prosecution "need not prove that the expert is undisputably correct," only that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *People v. Ramirez*, 155 P.3d 371, 378 (Colo. 2007) (quoting *Gallegos v. Swift & Co.*, 237 F.R.D. 633, 639 (D. Colo. 2006)). "Concerns about conflicting theories or the reliability of scientific principles go to the weight of the evidence, not its admissibility." *People v. Campbell*, 2018 COA 5, ¶ 42. Such concerns "are adequately addressed by vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (quoting *Est. of Ford v. Eicher*, 250 P.3d 262, 269 (Colo. 2011)).

¶ 22  "We review a trial court's evidentiary ruling for an abuse of discretion." *Id.* at ¶ 38. The trial court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or when [it] misapplies or misconstrues the law." *Fisher v. People*, 2020 CO

70, ¶ 13.  We review a preserved claim of *Shreck* error for

nonconstitutional harmless error.  *People v. Wilson*, 2013 COA 75,

¶ 24.  An error is harmless if it didn't substantially influence the

verdict or impair the trial's fairness.  *Id.*

### 3.    Analysis

#### a.    The Court Didn't Abuse Its Discretion by Deciding a *Shreck* Hearing Was Unnecessary

¶ 23    The trial court acted within its discretion by not holding a

*Shreck* hearing.  The prosecution's proposed experts were all

licensed doctors who treated J.D. and reviewed his medical file.

They were qualified to give opinions on J.D.'s treatment, his medical

test results and records, and his diagnosis based on their

professional training and experience, which included eliminating

possible disorders and non-trauma-based injury.  Their testimony

concerned complex medical issues beyond the understanding of a

layperson and therefore assisted the jury's understanding of J.D.'s

injuries and diagnosis.

¶ 24    The doctors' expected testimony was based on a reasonably

reliable method of diagnosing SBS/AHT.  Specifically, SBS/AHT is a

diagnosis made by a multidisciplinary team of doctors and other

professionals after considering the facts and circumstances of the injuries. The experts would likely testify that they conducted several tests to eliminate the possibility that J.D. had any preconditions, genetic defects, or possible disorders that could account for his injuries being nontraumatic in origin. They would further explain that, while no single injury was diagnostic of SBS/AHT, the compilation of injuries, including brain and retinal bleeding, led to the diagnosis.

¶ 25    The experts' diagnostic method had wide peer acceptance, as indicated in the Consensus Statement, which was globally endorsed and explained why the scientific methodology wasn't flawed. *See Ramirez*, 155 P.3d at 378 (recognizing that admissible evidence need not be undisputedly correct: rather, the method employed by the expert to reach the conclusion need only be scientifically sound). Moreover, although the scientific principles of SBS/AHT were not in dispute like they are here, in *Martinez*, the supreme court noted that "[i]n applying *Shreck*, we assume . . . that the scientific principles of shaken-impact syndrome and subdural hematomas resulting from extreme accidents are reasonably reliable." 74 P.3d at 323.

¶ 26     Finally, the evidence's probative value was not substantially outweighed by any danger of unfair prejudice, particularly where Sugg could object to the experts' testimony at trial, would have the opportunity to cross-examine the experts, and could present his own competing expert testimony.

¶ 27     Because the court already had sufficient information to make specific findings under CRE 403 and CRE 702 about the reasonable reliability of the scientific principles involved, a *Shreck* hearing was unnecessary. *See Rector*, 248 P.3d at 1201 (if a trial court has sufficient information to make findings on the reliability of the scientific principles involved, the experts' qualifications to testify to such matters, the helpfulness of the information to the jury, and any potential prejudice, it need not conduct an evidentiary hearing).

b.     Admitting Evidence of SBS/AHT

¶ 28     Next, Sugg contends that the trial court erred by admitting evidence supporting an SBS/AHT diagnosis because SBS/AHT lacks scientific reliability and "is one of the most controversial medical theories today." He offers several articles, studies, and case law from other jurisdictions questioning SBS/AHT as a "default diagnosis."

16

¶ 29    Sugg's assertion is misplaced.  He asserts that SBS/AHT is itself an unreliable medical diagnosis, but that argument goes to the *weight* of the evidence rather than its *admissibility*.  And such concerns are adequately addressed by "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Campbell*, ¶ 42 (quoting *Est. of Ford*, 250 P.2d at 269).  Sugg's attorney cross-examined the prosecution's experts and provided contrary testimony through an expert explaining that J.D.'s injuries were likely the result of a pre-existing condition that put him at risk for the injuries he suffered.  Determining the persuasiveness of competing expert opinions and evaluating the reliability of underlying scientific principles are quintessential functions of the jury.  *People v. Baker*, 2021 CO 29, ¶ 34; *see also Scott v. People*, 444 P.2d 388, 393 (Colo. 1968) ("The weight to be accorded opinion evidence given by experts is a question solely for the jury.").

¶ 30    Here, the jury found the weight of the prosecution's evidence more compelling and such a finding was independent from whether the evidence was admissible.  Because Sugg's argument focuses on the former and not the latter, for several reasons, we can't say that

the court erred by admitting expert testimony that otherwise met the admissibility standards under CRE 702 and CRE 403.

¶ 31     First, as mentioned, the prosecution's proposed experts were licensed doctors who had personally treated J.D. or reviewed his medical files in depth and were in a unique position to describe J.D.'s medical diagnosis, testing, and the contribution of symptoms that informed their ultimate conclusions.

¶ 32     Second, contrary to what Sugg asserts, SBS/AHT wasn't a "default diagnosis"; rather, the prosecution's experts testified that they conducted several tests to eliminate the possibility that J.D. had any preconditions, genetic defects, or disorders that could explain his injuries as resulting from a nontraumatic event.  This diagnostic method has wide peer acceptance, as indicated in the Consensus Statement, which was globally endorsed.

¶ 33     Third, the diagnosis and underlying medical findings involved complex neurological and pediatric considerations beyond the understanding of a layperson, and the testimony assisted the jury in understanding both the nature of J.D.'s injuries and how they may have been caused by trauma.

18

¶ 34    Finally, the testimony's probative value wasn't substantially outweighed by any danger of unfair prejudice.  Sugg's counsel challenged the experts' testimony at trial by lodging several objections, vigorously cross-examining the prosecution's experts, presenting a competing expert witness, and advancing alternative medical explanations for J.D.'s condition.

## B.    The Trial Court Didn't Err by Admitting the Neighbors' Testimony

¶ 35    Sugg argues that the court should have excluded the neighbors' testimony because it wasn't logically relevant, was prejudicial, and had minimal probative value.  We disagree.

### 1.    Additional Applicable Facts

¶ 36    L.D. and Sugg lived in a duplex, and Brenda Patterson and her daughter, Crystal Walker, lived together in the unit below.  The prosecution notified the court that it intended to introduce other acts evidence through Patterson's and Walker's testimony and their written statements to police to prove Sugg's intent, motive, and lack of accident.  Sugg's counsel objected, arguing that Patterson and Walker had insufficient knowledge to provide evidence concerning Sugg's behavior.

¶ 37    The trial court held a hearing to determine the admissibility and scope of the proposed testimony.  Walker and Patterson each testified that they (1) didn't know Sugg or L.D. well; (2) could hear Sugg and L.D. through the ceiling dividing their units; and (3) knew the layout of Sugg and L.D.'s apartment because it was directly above their own, and they had previously toured it before Sugg and L.D. moved into the unit.  Both Patterson and Walker testified that their assumptions about what happened were based on inferences from what they heard through the ceiling.

¶ 38    Walker testified that she frequently heard Sugg playing video games, which were very loud, and that she would hear J.D. cry.  Sugg would "tr[y] to quiet the baby and go back to his game."  When asked how she was able to tell that Sugg was yelling at the baby and not at the game, Walker explained that she could hear the baby crying in the back room and that she would hear Sugg's footsteps moving toward the back room and his voice got louder when he yelled at J.D.  Walker testified that she heard Sugg tell J.D. "to quit being such a pussy and be quiet."  Patterson similarly testified that she could hear Sugg playing video games and heard Sugg say, "Just calm down you little girl," or "Calm down, little pussy" to J.D.

Additionally, Patterson testified that one time before or after Christmas, she heard J.D. screaming for a long time "and then all of a sudden, it just went dead silent. It was kind of eerily silent."

¶ 39    The prosecution asked the court to consider Walker's and Patterson's written statements as well as their testimony in its analysis. The court conducted an admissibility analysis under *People v. Spoto*, 795 P.2d 1314 (Colo. 1990), and found that the evidence (1) was relevant to Sugg's intent and lack of mistake when interacting with J.D.; (2) showed Sugg's "escalating pattern of conduct towards J.D."; and (3) wasn't unduly prejudicial. Although the court ruled that some of the evidence — like testimony that Walker conducted a wellness check — was not admissible, the court allowed most of Walker's and Patterson's testimony under CRE 404(b).

¶ 40    Before Walker and Patterson testified, the court gave the jury the following limiting instruction:

> Ladies and gentlemen, the evidence you are about to hear is being presented for the following limited purposes only: As to whether Mr. Sugg had the intent to commit the crime charged, whether Mr. Sugg had motive to commit the crime charged, or as to a lack of

21

mistake with regards to the crime charged.
You may not consider it for any other purpose.

Sugg's counsel objected when the evidence went beyond what Walker and Patterson had heard, and the court sustained the objections. It also told the jurors that they couldn't consider stricken testimony and reminded the witnesses that they could only testify to what they had heard.

### 2. Applicable Law and Standard of Review

¶ 41 Admission of prior acts evidence is restricted under the rules of evidence because of its potential to unfairly prejudice the defendant. *Perez v. People*, 2015 CO 45, ¶ 24. To that end, CRE 404(b) prohibits the admission of such evidence if offered to prove a person's character and to show that the person acted in conformity with that character trait on a particular occasion, which is "often described as the defendant's propensity to commit a particular crime." *Masters v. People*, 58 P.3d 979, 995 (Colo. 2002). But such evidence may be admissible if it's admitted for purposes independent of an inference of bad character, such as to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." CRE 404(b)(2).

22

¶ 42    To determine admissibility under CRE 404(b), the court must

analyze the prior bad acts evidence under the *Spoto* test. *See*

*People v. Ramirez*, 18 P.3d 822, 828 (Colo. App. 2000). Under this

test, a trial court must find that the evidence (1) "relates to a

material fact"; (2) is "logically relevant"; (3) has such relevance

"independent of the intermediate inference, prohibited by CRE

404(b), that the defendant has a bad character" and acted in

conformity therewith; and (4) satisfies CRE 403 by having probative

value that is not "substantially outweighed by the danger of unfair

prejudice." *Spoto*, 795 P.2d at 1318.

¶ 43    Trial courts have substantial discretion in deciding whether to

admit evidence of prior acts. *Perez*, ¶ 22. We review the trial

court's ruling for an abuse of discretion. *Id.* Because this claim is

preserved, if we conclude that the court abused its discretion, we

must reverse Sugg's conviction unless the error was harmless,

meaning that there is no reasonable probability that the error

"contributed to [Sugg's] conviction." *People v. Roman*, 2017 CO 70,

¶ 13.

### 3. Analysis

¶ 44 The trial court didn't abuse its discretion by admitting Walker's and Patterson's testimony for two reasons. First, the court conducted a pretrial hearing to determine the admissibility and scope of the proposed evidence, which it analyzed under the *Spoto* framework. It then went on to make detailed findings, all of which have record support, that the neighbors' accounts of what they heard were probative of Sugg's state of mind when interacting with J.D., relevant to the circumstances that could explain why Sugg may have injured J.D., and relevant to whether J.D.'s injuries could plausibly have resulted from any mistake. The court also concluded that the testimony helped explain the temporal context surrounding J.D.'s injuries.

¶ 45 Likewise, Walker's and Patterson's testimony that J.D. fell silent after Sugg rose and intervened bore directly on permissible noncharacter considerations permitted under *Spoto*, because the testimony helped prove intent, motive, and absence of mistake. *See* CRE 404(b); *Spoto*, 795 P.2d at 1318. From their testimony, a reasonable juror could infer that J.D. had been crying and that Sugg acted with the purpose of silencing him, thereby supporting

24

the theory that his conduct was intentional and that J.D.'s injuries weren't accidental.

¶ 46 Second, the court implemented evidentiary safeguards. It limited the scope of admissible testimony to only what Walker and Patterson heard from L.D. and Sugg's apartment. It also concluded that any potential for unfair prejudice could be mitigated through a proper limiting instruction, which it read to the jury before Walker testified and again when Patterson testified. The court instructed the jury that it could consider the evidence only for the limited purposes of determining intent, motive, or lack of mistake with regards to the crime charged, "and no other purpose."

¶ 47 The record demonstrates that the court carefully enforced these limitations during trial. When defense counsel objected to testimony that exceeded the permitted scope, the court sustained those objections, and it later repeated the same limiting language in its final jury instructions. The safeguards implemented by the court ensured that the jury considered the evidence only for its legitimate, nonpropensity purposes and minimized the risk that the testimony would be used to draw an improper character inference.

¶ 48    Separately, any concern regarding unfair prejudice was diminished by the limited role that Walker's and Patterson's testimony played at trial. Their testimony constituted only a brief portion of the proceedings, and the prosecution didn't rely extensively on their statements as cornerstones of its case-in-chief, instead presenting substantial expert testimony to establish its theory.

¶ 49    Considering the trial court's pretrial *Spoto* analysis, its enforcement limiting the scope of the trial testimony, and its repeated limiting instructions to the jury, admitting Walker's and Patterson's testimony wasn't an abuse of discretion.

### C.    The Trial Court Didn't Err by Refusing to Reopen Evidence After the Jury Started Deliberating

¶ 50    Sugg argues that the trial court erred by refusing to provide a remedy when L.D. revealed new evidence after closing arguments. We disagree.

### 1.    Additional Applicable Facts

¶ 51    The jury received the case late on a Friday afternoon and resumed deliberations the following Tuesday morning. That morning, Sugg's counsel moved to reopen evidence because (1) L.D.

had seen and photographed a tablet in J.D.'s hospital room indicating that the child abuse protection team had already diagnosed J.D. with child abuse before running diagnostic tests; (2) although L.D. had previously declined to release her prenatal records, which indicated that J.D. had an oversized skull, she now wanted to release them to see if they would help Sugg's defense; and (3) L.D. realized after she finished testifying that she incorrectly said that J.D. could not hold his head up during the span of time in question. Alternatively, Sugg's counsel moved for a mistrial.

¶ 52 The prosecution objected, arguing that (1) Sugg already knew about the information on the tablet and that, at his counsel's request, the child abuse care team's assessment had been redacted from Sugg's police interview; (2) the information in the prenatal records was "[c]ompletely speculative"; and (3) whether J.D. could hold his head up was irrelevant to whether Sugg knowingly or recklessly caused J.D.'s injury.

¶ 53 The court denied Sugg's motions, ruling that (1) the medical team's alleged "knee-jerk" diagnosis was "already before the jury and [that the court didn't] see anything new" about the photograph of the tablet that would change that; (2) L.D.'s opinion about Sugg's

innocence or guilt was irrelevant; and (3) J.D.'s ability to hold his head up could be considered new evidence, but Sugg failed to provide any legal argument that would permit the court to reopen evidence after the jury had started deliberating. The court didn't see a basis for declaring a mistrial and instructed Sugg that he could file a motion for a new trial based on newly discovered evidence if he was convicted.

¶ 54 The jury found Sugg guilty, and he subsequently filed a motion for a new trial under Crim. P. 33 raising the same three arguments, along with the argument that Walker's and Patterson's testimony was erroneously admitted under CRE 404(b). The court denied the motion, finding that (1) L.D.'s "observations about the timing of the prosecution experts' opinions (which observations were actually known to [Sugg] prior to trial) ha[d] little to no relevance to the legal issues under the case"; (2) Sugg's expert had already testified that J.D.'s injury was not because of SBS/AHT but because of J.D.'s pre-existing medical condition, and the jury had rejected that conclusion; and (3) whether J.D. could hold his head up "did not appear to be a lynchpin fact" for the prosecution's case and likely wouldn't result in an acquittal.

### 2. Interrupting Jury Deliberations

#### a. Standard of Review and Applicable Law

¶ 55 The Due Process Clauses of the United States Constitution and the Colorado Constitution guarantee every criminal defendant the right to a fair trial. U.S. Const. amends. V, XIV; Colo. Const. art. II, §§ 16, 25; *Howard-Walker v. People*, 2019 CO 69, ¶ 23. This right includes the right to a trial before an impartial judge, *People v. Hagos*, 250 P.3d 596, 611 (Colo. App. 2009), and the right to an impartial finder of fact, *Morrison v. People*, 19 P.3d 668, 672 (Colo. 2000). The Colorado Supreme Court has held that trial courts are permitted to reopen cases and allow parties to admit additional evidence "whenever the ends of justice can be advanced thereby." *People v. Hall*, 2021 CO 71M, ¶ 24 (quoting *Plummer v. Struby-Estabrooke Mercantile Co.*, 47 P. 294, 295 (Colo. 1896)).

¶ 56 We review a trial court's decision to deny a defendant's request to reopen the evidence in a trial for an abuse of discretion. *People v. Martin*, 2014 COA 112, ¶ 31.

#### b. Analysis

¶ 57 The trial court didn't abuse its discretion by declining to reopen the evidence. As the trial court correctly observed, Sugg's

counsel failed to cite any authority permitting the interruption of jury deliberations under the circumstances presented. First, the information Sugg sought to introduce from the tablet wasn't newly discovered. While L.D. gave the photograph to the defense after the close of evidence, Sugg acknowledged the information on the tablet during his police interview and suggested that the doctors rule out L.D.'s fall as a potential source of J.D.'s injuries. Sugg's attorney asked to have the discussion concerning the tablet redacted from his interview, and it was. Likewise, Sugg's counsel chose not to question L.D. about the tablet during cross-examination. Counsel having made those strategic decisions, Sugg could not later seek to reopen the evidence during jury deliberations merely because counsel subsequently regretted them. The trial court therefore acted within its discretion by concluding that the proffered information didn't constitute new evidence warranting the extraordinary step of interrupting deliberations.

¶ 58 Additionally, L.D.'s willingness to sign a release permitting access to her prenatal medical records didn't require the court to halt deliberations and reopen the case. L.D. had previously declined to waive her medical privilege during trial, and a party's

change of heart after the close of evidence does not, by itself, constitute grounds for reopening the case. *See Farrar v. People*, 208 P.3d 702, 706-07 (Colo. 2009); *see also Blass v. People*, 247 P. 177, 178 (Colo. 1926) (the defendant is not entitled to a new trial simply because a witness has recanted). Allowing parties to revisit privilege decisions once the jury has begun deliberating would undermine the finality of trial proceedings and strain judicial resources.

¶ 59    Sugg argues that the prenatal records, which revealed J.D.'s large head circumference, were essential for the jury to evaluate the strength of his defense — that J.D.'s macrocephaly made him susceptible to his injuries. We aren't persuaded. Sugg's counsel didn't develop the argument that the introduction of these records would have aided in the defense. Even if counsel had developed the argument, the jury had already heard testimony from Drs. Rothfeder and Wilkinson that J.D. had a large head circumference and that his head size may have predisposed him to injury, so L.D.'s prenatal records contained evidence that the jury was already considering.

¶ 60 Finally, L.D.'s claimed realization that she had incorrectly testified that J.D. couldn't hold his head up didn't justify the extraordinary step of interrupting jury deliberations. A witness's later belief that a statement may have been inaccurate, standing alone, is insufficient to warrant reopening the record. *See Farrar*, 208 P.3d at 707 ("[A] demonstration of false or mistaken testimony can entitle a defendant to a new trial only if the newly discovered evidence would also probably result in an acquittal."). Contrary to Sugg's assertion, the prosecution didn't rely on J.D.'s inability to hold his head up during closing. Instead, the prosecution grounded its argument primarily in the expert testimony of the treating physicians and Dr. Rothfeder. At most, the record reflects a brief reference to the issue during closing, amounting to three sentences within a much broader presentation. Given the weight of the medical testimony supporting the jury's verdict, it's unlikely that this evidence would have produced an acquittal.

¶ 61 Accordingly, the court didn't err by declining to interrupt the jury's deliberations to take additional evidence.

### 3.  Motion for Mistrial

¶ 62    Sugg argues that the trial court erred by denying his motion for a mistrial.  We disagree.

#### a.  Standard of Review and Applicable Law

¶ 63    We review a trial court's denial of a motion for a mistrial for an abuse of discretion.  *People v. Van Meter*, 2018 COA 13, ¶ 9.  "A mistrial is a drastic remedy warranted only where 'the prejudice to the accused is too substantial to be remedied by other means.'"  *People v. Dominguez-Castor*, 2020 COA 1, ¶ 95 (quoting *People v. Collins*, 730 P.2d 293, 303 (Colo. 1986)).

#### b.  Analysis

¶ 64    The trial court didn't abuse its discretion by denying Sugg's motion for a mistrial.  First, as discussed above, the information contained in the tablet was not newly discovered.  Sugg and his counsel were aware of it, yet counsel chose to omit the evidence contained in the tablet.  Sugg cannot recharacterize information as newly discovered when it was already in his knowledge and control but was strategically excluded from counsel's evidentiary presentation.

¶ 65 Similarly, L.D.'s later decision to waive her medical privilege and permit access to her medical records didn't require a mistrial. Sugg requested the records before trial, and L.D. initially declined to waive the privilege. Her subsequent change of position — particularly after the close of the evidence — reflects only a change of opinion, not the discovery of material evidence previously unavailable despite due diligence. Such post hoc developments do not justify a mistrial.

¶ 66 Finally, L.D.'s post-trial realization that she mistakenly testified that J.D. couldn't hold his head up did not, without more, justify declaring a mistrial. The record further reflects that the prosecution didn't rely on the challenged testimony as a substantive component of its case: It made up a small portion of L.D.'s overall testimony and was referenced only briefly during closing arguments.

¶ 67 None of these circumstances indicate that Sugg was deprived of a fair trial requiring the court to declare a mistrial; the court therefore acted within its discretion by denying the motion.

## 4. The Motion for a New Trial

¶ 68    Sugg argues that the trial court erred by denying his motion for a new trial. We disagree.

### a. Standard of Review and Applicable Law

¶ 69    Motions for a new trial based on newly discovered evidence are regarded with disfavor. *See Farrar*, 208 P.3d at 706. Accordingly, we review a trial court's decision to grant or deny a motion for a new trial for an abuse of discretion. *People v. Bueno*, 2018 CO 4, ¶ 19.

¶ 70    To succeed on his motion for a new trial, Sugg was required to show that (1) the new evidence was discovered after the trial; (2) he and his counsel were diligent in their efforts to discover the evidence prior to and during trial; (3) the newly discovered evidence was material and not merely cumulative or impeaching; and (4) on retrial, the newly discovered evidence would probably produce an acquittal. *People v. Gutierrez*, 622 P.2d 547, 559-60 (Colo. 1981).

### b. Analysis

¶ 71    The trial court didn't abuse its discretion by denying Sugg's motion because none of the proffered information qualifies as newly discovered evidence.

35

¶ 72    First, as already mentioned, the information contained on the tablet wasn't discovered after trial.  Evidence can't be considered newly discovered when the defendant was aware of the information prior to trial but simply failed to introduce it.  *Cf. Farrar*, 208 P.3d at 706 ("[W]e have consistently made clear that evidence will be considered newly discovered for purposes of a motion for new trial only if it was both unknown to the defendant and his counsel in time to be meaningfully confronted at trial and unknowable through the exercise of due diligence.").  Because the information was within Sugg's knowledge and available to the defense, the first *Gutierrez* element isn't satisfied.

¶ 73    Second, L.D.'s decision after trial to waive her medical privilege and release her prenatal records doesn't qualify as newly discovered evidence.  The existence of the records was known before trial; indeed, Sugg attempted to obtain them.  L.D.'s prior refusal to waive her privilege doesn't convert the records into newly discovered evidence and doesn't meet the standard for the first *Gutierrez* element.

¶ 74    Third, L.D.'s claimed post-trial realization that portions of her testimony were incorrect likewise didn't constitute newly discovered

36

evidence. She didn't learn any new facts after trial; rather, she just claimed that her testimony was incorrect. Because the underlying information wasn't new information and, if allowed, would have amounted to impeachment of L.D.'s prior testimony, the first and third *Gutierrez* elements aren't met.

¶ 75    Accordingly, the trial court acted within its discretion by denying Sugg's motion for a new trial.

### III.    Disposition

¶ 76    The judgment is affirmed.

JUDGE J. JONES and JUDGE LUM concur.